<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **YUJUE WANG & PENG XIE**, <br><br> Plaintiffs, <br><br> v. <br><br> **NEW JERSEY STATE POLICE**, *et al.*, <br><br> Defendants. | Civil Action No. 18-11933 (ZNQ) (TJB) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion for Summary Judgment ("Motion", ECF No. 117) filed by Defendant Detective Joseph Czech ("Defendant" or "Czech"). In support of the Motion, Defendant filed a Moving Brief.  ("Moving Br.", ECF No. 117-1.) Plaintiffs Yujue Wang ("Wang") and Peng Xie ("Xie")[1] (collectively, "Plaintiffs") opposed ("Opp'n Br.", ECF No. 129) and Defendant replied ("Reply Br.", ECF No. 132).  After careful consideration of the parties' submissions, the Court decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons set forth below, the Court will **GRANT IN PART AND DENY IN PART** Defendant's Motion.

---

[1] Yujue Wang's first name appears at various times in the briefs and supporting documents as both "Yujue" and "Yujie."  Plaintiff Peng Xie's last name appears at various times as both "Xie" and "Xiu."  For consistency, the Court uses the first name "Yujue" for Plaintiff Wang and the last name "Xie" for Plaintiff Xie because this is how the names appear in Plaintiffs' Opposition (*see generally* Opp'n) and how Plaintiff Wang's name appears in her deposition (*see generally* "Wang Dep.", ECF No. 117-7 Ex. B) and in the image of her driver's license she supplied to the Court.  (*See* ECF No. 129-17 Ex. M.)  The Court uses the term "Plaintiffs" to mean both Wang and her husband Xie.  Where the Court uses the singular "Plaintiff," this refers only to Wang.

I.     **BACKGROUND AND PROCEDURAL HISTORY**

   **A. Factual Background**

Plaintiffs filed their initial Complaint on July 22, 2018 against Defendants New Jersey State Police ("NJSP"), Detective Czech, Detective Brian Quirk ("Quirk"), Joseph Fuentes ("Fuentes"), John Does 1–10, and ABC Public Entity/Agency 1–10.   (ECF No. 1; *see also* Defendant's Statement of Undisputed Material Facts, "D's SUMF", ECF No. 117-2 ¶ 1.)  Plaintiff Wang is a United States citizen of Chinese nationality.   She and her husband Xie operate a restaurant in Highland Park, New Jersey.  ("Ps' Counterstmt. of Fact", ECF No. 129-3 ¶ 1.)  Wang holds dual bachelor's degrees from Pennsylvania State University, and testified that she previously worked as a marketing and advertising executive and as Vice President of an event planning company.  (*Id.* ¶¶ 2–4; Wang Dep. at 14:10–19:25, 21:9-18.)

   1.  Investigation Background

In January 2016, the NJSP's Trafficking Central Unit ("TCU") began an investigation of the Grand Health Spa ("Spa") located at 689 Georges Road, New Brunswick, Middlesex County, New Jersey, after receiving information from a confidential source that the spa was a "fictitious business front" that was engaging in prostitution and possibly involved in human trafficking.[2]  (*See* D's SUMF ¶ 4; "NJSP OPS Rep.", ECF No. 118-6 Ex. R at NJSP Wang 116–17;[3] *see also generally* "Czech Investig. Rep.", ECF No. 118-1 Ex. M.)  The Spa shares the parking lot with a hair salon and other businesses, which are next door.  (Deposition of John Cipot, "Cipot Dep.", ECF No. 117-9 Ex. D at 53:15-16, 54:25–55:3; "Czech Dep.", ECF No. 117-10 Ex. E at 62:12-19.)  Between January 2016 and March 2016, Detective Sergeant ("DSG") Glenn Sefick entered

---

[2] During the course of the TCU's investigation, it was revealed that the Spa was not a human trafficking operation. (*See* NJPS OPS Rep. at 5.)
[3] When referencing some of the sealed Exhibits to the Motion at ECF No. 118, for clarity the Court uses the BATES numbers marked on the documents (e.g., "NJSP Wang [X]").

the Spa undercover on three separate occasions in order to solicit prostitution.  (D's SUMF ¶ 5; NJSP OPS Rep. at 3–4.)

Sefick made his second visit to the Spa on February 9, 2016 ("February 9, 2016 Field Investigation").  (D's SUMF ¶ 6; Czech Dep. at 7:2-9; "Czech Supp. Rep.", ECF No. 118-4 Ex. P at NJSP Wang 052.)  Czech was the NJSP case agent for the February 9, 2016 Field Investigation and reported directly to Detective Sergeant First Class John Cipot, although multiple NJSP troopers directly participated in and had direct knowledge of the investigation.  (Ps' Counterstmt. of Fact ¶¶ 57, 59; Czech Dep. at 10:13-20, 33:8-20; "Sefick Investig. Tr.", ECF No. 117-15 Ex. L at 9:2-4.)  As the case agent, Czech was responsible for (1) identifying criminal suspects, (2) carrying out investigations against suspects, (3) providing sworn affidavits to the courts about the field investigations, and (4) conducting related arrests.  (Ps' Counterstmt. of Fact ¶ 58; Czech Dep. at 33:21–34:11.)

During the February 9, 2016 Field Investigation, Defendant alleges that unidentified troopers surveilling the Spa observed a black Infiniti EX3 bearing New Jersey license plate number X95FTF ("Infiniti") pull into the parking lot adjacent to the Spa.  (D's SUMF ¶ 6; Czech Dep. at 7:2-9; Czech Supp. Rep. at NJSP Wang 052.)  After analyzing the license plates, the troopers learned the Infiniti was registered to Plaintiff Yujue Wang.  (D's SUMF ¶ 6; Czech Supp. Rep. at NJSP Wang 052; NJSP OPS Rep. at NJSP Wang 117; "Cipot Cert.", ECF No. 117-16 Ex. T at 2.)  Defendant claims that the driver, who an unidentified NJSP trooper matched to Wang's DMV photo ("DMV Photo"), exited the vehicle with a passenger and went into the Spa through the rear door.  (D's SUMF ¶ 7; Czech Supp. Rep. at NJSP Wang 052; Cipot Dep. at 48:7-15, 51:24-25; Czech Dep. at 66:18–67:10.)[4]

---

[4] As the Court will discuss *infra*, Plaintiffs dispute the alleged facts in this paragraph.  (Ps' Response to D's SUMF ¶ 15; Wang Dep. at 39:22-23; 94:20-95:19, 96:24–97:10.)

NJSP conducted physical surveillance of the Spa on three other dates in February and March 2016 but did not observe Wang or the Infiniti on any of these dates.  (Czech Supp. Rep. at NJSP Wang 052–053; Czech Dep. at 159:4–160:13.)  They had not previously observed Wang or the Infiniti at the Spa during their prior physical surveillance dates beginning on February 2, 2016 and did not record that they observed Wang or the Infiniti on any other occasion.  (*See generally* Czech Supp. Rep.)

After the troopers arrived at the Spa, Sefick entered the Spa, paid for a massage, and was directed to a room with a massage table.  (D's SUMF ¶ 8; "Sefick Rep.", ECF No. 118-2 Ex. N at NJSP Wang 057.)  An Asian woman who identified herself as "Lupe"—who Sefick later recorded in his investigation report was approximately five feet, five inches tall and weighed approximately 120 pounds—entered his room.  (*Id.*)  "Lupe" began to engage in sexual contact with Sefick, then undressed and asked whether Sefick wanted to have sex with her; he responded affirmatively and after a price negotiation, offered "Lupe" $100 in cash.  (D's SUMF ¶¶ 9–10; Sefick Rep. at NJSP Wang 058.)  "Lupe" accepted the payment, at which point Sefick looked at his watch, advised "Lupe" he was late for work, and told her he would still pay her but that she owed him a "sexual encounter" the next time he returned to the Spa.  (D's SUMF ¶ 11; Sefick Rep. at NJSP Wang 058.)

At some point after Sefick left the Spa, Defendant Czech alleges he met with Sefick and Cipot at a nearby pre-arranged meeting location for a debriefing, where Sefick was allegedly shown the DMV Photo of Plaintiff Wang and identified "Lupe" as the same person in the photo. (D's SUMF ¶¶ 12–13; "Sefick Dep.", ECF No. 117-8 Ex. C at 90:5-13; Cipot Dep. at 45:11-18,

49:5-11; Sefick Rep. at NJSP Wang 058; Sefick Investig. Tr. at 8:2-6; "Czech Investig. Tr.", ECF No. 117-13 Ex. J at 14:1-5.)[5]

2. The Photo Identification and February 9, 2016 Field Investigation Procedures

a. The Photo Identification

Defendant alleges that after the Infiniti pulled into the parking lot near the Spa, an unidentified NSJP trooper "immediately" ran the Infiniti license plate to obtain its registration information and confirmed it was registered to Wang. (Ps' Counterstmt. of Fact ¶ 85–86, 92, 102; Cipot Dep. at 47:1-48:15.)   Next, Defendant claims that an unidentified NJSP trooper (the "Eyeball") saw the Infiniti driver and passenger exit the vehicle, and was able to identify Wang and confirm she was the driver. (Czech Dep. at 70:18–71-16, 170:15-22.)   Czech does not recall the identity of the Eyeball. (Ps' Counterstmt. of Fact ¶¶ 101–02; Czech Dep. at 60:11-15.)   It is also unclear who ran the Infiniti registration to determine it was registered to Wang, or who obtained the DMV Photo of Wang out of five individual investigators including Cipot. (Ps' Counterstmt. of Fact ¶¶ 103–04; Cipot Dep. at 47:6-48:3.)   The identification is thought to have occurred from the Auto Zone parking lot across the street from the Spa or from the adjacent parking lot across from the Spa, more than 100 feet away from Wang's alleged location. (Ps' Counterstmt. of Fact ¶ 92; Czech Dep. at 58:6-15; Cipot Dep. 69:11–70:22; ECF No. 129-14 Ex. J.)   The Eyeball did not provide any description of the passenger who exited the Infiniti. (Ps' Counterstmt. of Fact ¶ 94; Cipot Dep. at 73:13–74:13.)   At some point after Sefick exited the Spa, Cipot allegedly showed Wang's digital DMV Photo on a laptop to Sefick for the purpose of conducting an out-of-court photo identification. (Ps' Counterstmt. of Fact ¶ 85–86, 92, 102; Cipot Dep. at 47:1-48:15.) Although Cipot does not recall the specifics of the identification, he recalls he "turned the laptop,

---

[5] As the Court will discuss *infra*, Plaintiffs dispute the alleged facts in this sentence. (Ps' Response to D's SUMF ¶ 15; Wang Dep. at 39:22-23; 94:20-95:19, 96:24–97:10.)

showed [Sefick] the device, [and asked:] Is this the suspect?  Yes.  That's all it was. . . . It was a simple identification[.]"  (Ps' Counterstmt. of Fact ¶ 87; Cipot Dep. at 63:10-19.)  Sefick cannot recall who showed him the DMV Photo and whether he identified Wang via her DMV Photo on February 9, 2016 or whether the identification occurred a day later.  (Sefick Dep. 87-18–88-5; *see also* Cipot Dep. at 46:2-9; Ps' Counterstmt. of Fact ¶ 119; D's Reply Supp. ¶ 119.)  Neither Czech nor Cipot received training from the NJSP about the challenges and perils of cross-racial eyewitness identifications.  (Ps' Counterstmt. of Fact ¶¶ 89–90; Czech Dep. at 71:13–72:16; Cipot Dep. at 55:19–56:2, 56:11–57:5; D Reply Supp. ¶¶ 89–90.)

The NJSP SOP and New Jersey Attorney General ("NJAG") guidelines require detailed documentation of the photo identification process, including the verbal exchange between the witness and the photo lineup or "show-up"[6] administrator and the level of confidence of the witness making the identification.  (Ps' Counterstmt. of Fact ¶ 79–80; Czech Dep. at 15:15–16:16, 17:18–18:2; Deposition of Wesley Garland, "Garland Dep.", ECF No. 129-12 Ex. H at 41:8-21; Rep. of Joseph J. Blaettler, "Blaettler Rep.", ECF No. 117-19 Ex. X at 37 (quoting NJ SOP F51 issued on April 5, 2010); *id.* at 40–41 (quoting NJAG guidelines for photo identification procedures dated April 18, 2001).)  Czech was aware of the SOP and the NJAG guidelines prior to the February 9, 2016 Field Investigation.  (Czech Dep. at 12:1–13:6.)  However, Czech did not document in his investigation reports (*see generally* Czech Investig. Rep.; Czech Supp. Rep.; Czech Investig.

---

[6] NJ SOP F51, excerpted in Plaintiffs' expert report, defines a "show-up" photo identification procedure as a single suspect photo identification made a short time after witnessing a crime for the purposes of identifying a suspect as a perpetrator of the crime.  (*See* Blaettler Rep. at 37 (quoting NJ SOP F51 issued on April 5, 2010).)  NJ SOP F51 states: "Despite the [New Jersey Supreme Court] legal decision [in *State v. Herrera*, 187 N.J. 493 (2006) permitting the use of "show-up" photo identifications only if exigent circumstances that require immediate identification are present], the courts generally view the show-up process as "inherently suggestive."  (*Id.* at 39); *see also Herrera*, 187 N.J. at 504.  "However, the Courts have drawn the distinction between inherently and impermissibly suggestive."  (*Id.*); *see also Herrera*, 187 N.J. at 500, 504.  "Therefore, care must be taken when employing such a procedure that "is already viewed as suggestive and inherently suggestive by the courts."  (Blaettler Rep. at 37 (quoting NJ SOP F51 issued on April 5, 2010).)

Transcr.) where the photo identification occurred, the dialogue surrounding the identification, Sefick's level of confidence in the identification, whether Sefick was shown more than one photograph, or who exactly was present during the identification.  (Ps' Counterstmt. of Fact ¶ 81; Czech Dep. at 22:10–24:20.)

Although the DMV Photo was required to be placed into evidence (Ps' Counterstmt. of Fact ¶ 107; Czech Dep. at 111:17-24), Cipot testified that he did not believe the DMV Photo was placed into the NJSP evidence database.  (Ps' Counterstmt. of Fact ¶ 108; Cipot Dep. at 61:10–62:3.)  On February 5, 2021, in response to Plaintiffs' request to produce the DMV Photo in this case, Czech and NJSP produced Wang's DMV photo for her driver's license issued on September 20, 2019 (ECF No. 129-16 Ex. L; ECF No. 129-17 Ex. M), rather than the DMV Photo associated with her driver's license that was active on February 6, 2016.  (Ps' Counterstmt. of Fact ¶¶ 109–11; ECF No. 129-18 Ex. N; "Garland Cert.", ECF No. 129-19 Ex. O at 2 ¶ 4–7, 16.)[7]

b. February 9, 2016 Field Investigation Procedures

The NJSP Standard Operating Procedure ("SOP") for field investigations requires field investigators to create operation plans to document (1) the purpose of the field investigation, (2) who was involved in the field investigation, and (3) the methods or protocols used for field investigation activities.  (Ps' Counterstmt. of Fact ¶ 60; Czech Dep. at 73:24–74:7.)  Czech does not recall whether he ever created an operation plan, and admits that failure to do so would have been "an error on [his] part."  (Ps' Counterstmt. of Fact ¶¶ 61–63; Czech Dep. at 74:8–75:1.)  No

---

[7] Defendant attached a photograph he claims is the same one used to identify Wang on February 9, 2016 as an Exhibit to his Reply.  (ECF No. 132-2 at Ex. A.)  Defendant previously attempted to produce the photo via a letter dated September 22, 2023, two and a half years after the close of discovery (Garland Cert. at 2 ¶ 8–16), but Plaintiffs opposed. (D's Reply Supp. ¶ 111; ECF Nos. 110; 111.)  The Magistrate Judge conducted a conference with the parties as to discovery issues (including the late-produced photo) on October 20, 2023 and concluded that the disputes "will be addressed after the dispositive motions have been decided."  (*See* Oct. 20, 2023 Text Minute Entry.)  Because the propriety of the photo's much belated production remains to be resolved, the Court declines to consider the photo as part of this Motion for Summary Judgment.  Whether the photo may be introduced at any later trial is, however, a separate issue to be resolved another day.

operation plan has been produced as evidence in this case for the February 9, 2016 Field Investigation, although an operation plan was produced for an earlier field investigation date of January 6, 2016. (Czech Dep. at 73:15-23; *see also* ECF No. 129-9.)

Long-term operations such as the February 9, 2016 Field Investigation require the creation of surveillance activity logs. (Ps' Counterstmt. of Fact ¶¶ 72–73; Cipot Dep. 27:21-28:4, 28:10-13.) The NJSP did not produce surveillance activity logs for the February 9, 2016 Field Investigation, although such logs have been produced for other dates in February 2016, including time-stamped records and descriptions of NJSP's observations. (Ps' Counterstmt. of Fact ¶ 76; "Surveillance Activity Logs", ECF No. 129-10 at Ex. F.) However, after the February 9, 2016 Field Investigation, Czech prepared an investigative report that detailed the officers' findings on that day. (Czech Supp. Rep. at NJSP Wang 052.) Sefick prepared a supplemental investigation report on June 23, 2016 recording the details of his encounter with "Lupe." (Ps' Counterstmt. of Fact ¶ 96; Sefick Rep. at NJSP Wang 057.) Sefick testified that he destroyed his investigation notes after writing his report and that he was unsure whether a policy existed in February 2016 requiring investigation notes to be placed into evidence. (Sefick Dep. at 70:12–71:2.) Cipot testified that the NJSP SOP now requires investigation notes to be placed into evidence, and that he believes that this was also the case in February 2016 but is unsure. (Cipot Dep. at 125:5-10.)

3.   Wang's Arrest and Criminal Charges

a.   Czech's Affidavit

On July 20, 2016, Judge Michael A. Toto of the New Jersey Superior Court, Middlesex County ("Superior Court"), approved an arrest warrant for Wang and search and arrest warrants for several other suspects. ("Arrest Warrant", ECF No. 118-8 Ex. Z; ECF No. 118-3 Ex. O at NJSP Wang 075.) Czech's Affidavit of probable cause stated, in relevant part:

> I have probable cause to believe and do believe that Li Picarello ("Picarello'), Esmerlyn Duran-Gil ("Duran-Gil"), Jinhua Jin ("Jin"), *Yujue Wang* ("*Wang*"), Keumsuk Lee ("Lee") (collectively, the "Target Suspects"), and other yet to be identified individuals are involved in the commission of the specified crimes and use the Target Locations and Target Vehicles to do so.  I further have probable cause to believe, and do believe, that *evidence of the specified crimes will be located in the locations detailed in Paragraphs 2(A) through 2(C), the vehicles detailed in Paragraphs 2(D) through 2(E), and the safe deposit box detailed in Paragraph 2(F).*
>
> This investigation focused on the prostitution organization of Picarello, who is assisted by Duran-Gil, Jin, *Wang*, and Lee, and money laundering operation led by Duran-Gil and Lee. The aforementioned *Communications Data Warrants, video and physical surveillance at multiple locations, Grand Jury Subpoenas and extensive analysis of bank records of Picarello and Duran-Gil* indicate that Picarello, Duran-Gil, Jin, *Wang*, and Lee conspired with each other to operate at least two brothels, Grand Health Spa and Green Nature's Therapy.
>
> They obtained *large cash proceeds from these businesses, operated solely on prostitution, and laundered currency* through Guero Services, LLC, owned by Duran-Gil. . . . *It is believed the currency was comingled with proceeds illegally obtained through a larger prostitution network* of Picarello, Duran-Gil, Jin, *Wang*, and Lee.

("Czech Affidavit", ECF No. 129-21 Ex. Q at 5 ¶ 3, 8–9 ¶ 6 (emphases added).)  The only paragraphs in the 28-page Affidavit pertaining to Wang individually are the following two.  The first paragraph describes her as:

> an Asian female, approximately five feet, five inches, weighing approximately one hundred twenty pounds, with a date of birth of July 4, 1987, and with New Jersey Driver's License number W04187900057871, which reflects an address of 23 Sweetgum Lane, Monmouth Junction, New Jersey 08852.  An inquiry with the Federal Bureau of Investigation, Interstate Identification Index, revealed that Yujue Wang has a prior arrest record in the State of Texas for Alien Inadmissibility and is assigned Federal Bureau of Identification (FBI) number 265239CH1.[8]

---

[8] Wang testified that she is a law-abiding citizen who was never arrested or suspected of a crime before.  (Wang Dep. at 21:9–22:6; Ps' Counterstmt. of Fact ¶ 4.)  Defendant does not dispute that Wang testified to this.  (D's Reply Supp. at ¶ 4.)

(*Id.* at 4–5; *see also* Czech Dep. at 136:4-10.)  The second paragraph pertaining to Wang states:

> On February 9, 2016, I contacted the Grand Health Spa . . . to make an appointment. . . . UC#2 was then sent to the Grand Health Spa. A black Infiniti EX3 bearing New Jersey registration X95FTF arrived at the Grand Health Spa.  *A motor vehicle inquiry of the vehicle revealed the vehicle is registered to Yujue Wang*. . . . *Wang exited the vehicle and entered the rear of the spa*. . . .  UC#2, monitored by surveillance, approached and entered the rear of the Grand Health Spa.  Once inside, UC#2 was propositioned for sex acts by *Wang, negotiated prices, then declined*. . . . . *UC#2 paid $60.00 for a massage and was solicited for sex for $100.00*.

(*Id.* at 22 (emphases added).)  The Affidavit does not mention the DMV Photo identification.  All suspects named in the Affidavit, other than Wang, were alleged to have prior connections to prostitution, and all except one (the alleged owner of the Spa) were alleged to have prior arrests for prostitution-related or monetary offenses.  (*See generally id.*)  In his Affidavit, Czech did not reference any evidence specifically connecting Wang to any of the other parties named in the Affidavit, to the safe deposit box named in the Affidavit, to any named bank records, to any of the two Target Vehicles for which a search warrant was requested (neither of which included the Infiniti), or to the business known as Green Nature's Therapy.  (*See generally id.*)

### b.  Wang's Arrest and Criminal Charges

On July 21, 2016, while in New York City, Wang received a phone call from her husband stating that Czech and Quirk were at their home in New Jersey looking for her.  (Ps' Counterstmt. of Fact ¶ 11.)  Quirk took the phone and ordered her to report to the NJSP barracks in Cranbury, New Jersey; Wang met up with her husband and the two of them reported to the barracks.  (*Id.* ¶¶ 12–14.)  There, Plaintiffs met with Czech and Quirk who told Wang she was being charged with prostitution and other sex-related charges.  (*Id.* ¶ 15; Wang Dep. at 130:9-13.)  Wang testified that she told Czech and Quirk she was not involved in prostitution and was not the person they

were looking for; that someone may have stolen her identity; that she had never heard of, had never been to, and had never worked at the Grand Health Spa; and that she could provide the NJSP with documentation of her whereabouts.  (Ps' Counterstmt. of Fact ¶ 16; Wang Dep. at 131:14-25; 132:5; 21-25; 133:13-25; 134:14-25; "Wang Interrogatory", ECF No. 129-6 Ex. B, at 7 #3.)

Nevertheless, Wang was arrested the same day and transported to Middlesex County Jail. (D's SUMF ¶ 17; Wang Dep. at 178:15-17; ECF No. 118-5 Ex. Q at NJSP Wang 068.)[9]  Wang testified that her bail was set at $25,000 on July 21, 2016, and she was held in custody until July 26, 2016.  (Ps' Counterstmt. of Fact ¶¶ 25–31; Wang Dep. at 145:5-12; 149:13–151-5.)  Her passport was seized and she was unable to contact her husband and family for two to three days. ("Bail Bond App.", ECF No. 129-8 Ex. D; Wang Dep. at 147:22-23, 169:14-25.)  Wang also testified that her passport was not returned to her until thirteen months later, after the criminal charges against her were dismissed.  (*See* Wang Dep. at 169:14-16.)  She testified that she was not able to travel abroad, including to her home country of China, and lost all of her connections in China during that time.  (*See id.* at 169-14–170-3.)  A few days after her arrest, Wang was arraigned and criminally charged with second degree conspiracy to commit racketeering under N.J. Stat. 2C:41-2(c); third degree promoting prostitution under N.J. Stat. 2C:34-1(b)(2); third degree conspiracy to promote prostitution within a school zone under N.J. Stat. 2C:5-2(a); and a disorderly persons offense of prostitution under N.J.S.A. 2C:34-1(b)(1).  (D's SUMF ¶ 18; Ps' Counterstmt. of Fact ¶¶ 27, 29; ECF No. 118-7 Ex. S.)  Wang testified that after her arrest and subsequent criminal charges, she was diagnosed with PTSD, that a psychiatrist prescribed her medication for

---

[9] The Arrest Warrant for Wang refers to an incident that occurred on or about February 29, 2016, not February 9, 2016 when "Lupe" solicited money from Sefick in exchange for sex.  (*See generally* Arrest Warrant.)  On February 29, 2016, the NJSP conducted surveillance operations at a location other than the Spa.  (Ps' Counterstmt. of Fact ¶ 122; Czech Dep. at 72:17–20.)

depression and anxiety, and that she experienced suicidal thoughts.  (D's SUMF ¶ 26; Wang Dep. at 187:7–188:6.)

### 4.  Probable Cause Hearing and Dismissal of Criminal Charges

On June 15, 2017, Wang, through counsel Kimberly Yonta ("Yonta"), filed a motion in the Superior Court for a hearing to determine probable cause for her arrest.  (Ps' Counterstmt. of Fact ¶ 50; ECF No. 129-23.)   On August 21, 2017, Yonta filed a motion to dismiss the criminal complaint against Wang for lack of prosecution.  (Ps' Counterstmt. of Fact ¶ 51; ECF No. 129-24.)   During the hearing on the motions, on September 5, 2017, Supervising Deputy Attorney General ("DAG") Erik Daab ("Daab"), who was presiding over the TCU investigation, agreed to dismissal without prejudice of the criminal charges against Wang due to insufficient evidence. (D's SUMF ¶¶ 21–22; "D's Reply Supp.", ECF No. 132-1 ¶ 56; ECF No. 129-13 Ex. I at 7, 10–11; NJSP OPS Rep. at Wang 119.).  At the hearing, DAG Daab gave his reasoning for dismissal:

> I spoke to the person who was the head of the investigation [Czech] and asked him what the evidence was against [Wang] and he indicated that the evidence was that the trooper [Sefick] went in and engaged in at least a sexual conduct or some type of agreement with a person who he did not know at that time.  When they [sic] come out he indicated that there was a vehicle in the parking lot registered to somebody with the same name as this defendant.  And when the trooper [Sefick] was shown a photograph he said *I think that's her. And that was basically the sum and substance of the evidence.  He said he's not sure with the passage of time whether that would hold up in court and he said there is no other evidence other than that.*

(ECF No. 129-13 Ex. I at 11:1-14 (emphasis added).)  The same day, the Superior Court signed the order of dismissal of the criminal complaint without prejudice.  (ECF No. 129-22 Ex. R.)  In a report dated November 14, 2018, the New Jersey Office of Professional Standards stated the following regarding dismissal of the criminal charges against Wang:

> Det. I Quirk and Det. I Czech admitted the *sole reason they arrested Ms. Wang was because she was the registered owner of a car that*

> *parked in a public parking lot on the premises where the alleged criminal activity took place.* . . . . DAG Daab stated since DSG Sefick is a white male and Ms. Wang is an Asian female, his testimony would have been considered "*cross racial identification*." DAG Daab advised that courts have ruled recently that cross racial identification was "*inherently unreliable*."  Due to the passage of time, *DSG Sefick informed DAG Daab that he was unsure if he could positively identify Ms. Wang again.*  Considering all of these circumstances, *DAG Daab chose not to pursue the charges against Ms. Wang because he was unsure if he could get a conviction in court.*

(NJSP OPS Rep. at Wang 119 (emphases added).)  By the time the charges against Wang were dismissed, the other suspects in the investigation had pleaded guilty to more serious charges.  (D's SUMF ¶ 22; ECF No. 118 Ex. H at NJSP Wang 027.)

### B.  Procedural History

In the present case, Plaintiffs filed their First Complaint on July 22, 2018 against Defendants NJSP, Detective Czech, Detective Quirk, Fuentes, John Does 1–10, and ABC Public Entity/Agency 1–10 (collectively, "Original Defendants").  (ECF No. 1.)  Plaintiffs then filed their First Amended Complaint (ECF No. 5) and Second Amended Complaint ("SAC", ECF No. 6), to which Original Defendants did not respond.  Separately, on August 31, 2018, Plaintiffs filed a complaint against Detectives Quirk and Czech with the NJSP's Police Internal Affairs Investigation Bureau and the Office of Professional Standards alleging false arrest and racial profiling along with a number of other allegations.  (D's SUMF ¶ 23; "Ps' Response to D's SUMF", ECF No. 129-4 ¶ 23; *see generally* NJSP OPS Rep.)  NJSP's investigation (the "Internal Investigation"), overseen by Lieutenant Garland, "failed to develop sufficient evidence to substantiate those allegations."  (D's SUMF ¶ 24; ECF No. 117-18 Ex. W.)[10]

---

[10] Lieutenant Garland claims that he showed the DMV Photo to Sefick during the Internal Investigation; however, he did not list the DMV Photo on the Internal Investigation Attachment Log and no longer had access to the DMV Photo at the time of discovery.  (Ps' Counterstmt. of Fact ¶¶ 113–17; Garland Dep. at 57:23–58:3; Garland Cert. at 2 ¶ 4–7, 16; ECF No. 129-20 Ex. P.)

The Court issued a Consent Order to vacate a default judgment against Original Defendants and extended the time for Original Defendants to respond to the Second Amended Complaint. (ECF No. 14.)  On December 28, 2018, NJSP, Czech, Quirk, and Fuentes (collectively, "MTD Defendants") filed a motion to dismiss the Second Amended Complaint.  (ECF No. 15.)  On August 19, 2019, the Court granted in part and denied in part the motion to dismiss.  (ECF Nos. 25 and 26.)  Specifically, the Court dismissed with prejudice all claims against NJSP and Fuentes, and dismissed all claims against Quirk and Czech in their official capacities, as well as dismissing other portions of the Second Amended Complaint.  (*Id.*)

On December 21, 2020, Plaintiffs requested leave to file a third amended complaint.  (ECF No. 43.)  The Court denied the motion.  (ECF No. 47.)  As such, the operative complaint is the SAC dated August 7, 2018.  (ECF No. 6.)  In May 2022, the parties stipulated to dismissal with prejudice of Detective Quirk (ECF Nos. 83, 84), leaving Detective Czech as the only remaining Defendant named in this matter.

Given the Court's prior dismissal of many of Plaintiffs' claims, the only remaining counts from the twelve-count Second Amended Complaint are, as against Czech only in his individual capacity: Count I (42 U.S.C. § 1983 False Arrest/Imprisonment), Count II (42 U.S.C. § 1983 Malicious Prosecution), Count III (42 U.S.C. § 1985 Conspiracy), Count IX (Violation of the New Jersey Civil Rights Act "NJCRA", N.J. Stat. 10:6-1–2),[11] Count X (Negligent and Intentional Infliction of Emotional Distress), Count XI (Per Quod), and Count XII (Punitive Damages).

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ.

---

[11] The Court dismissed the NJCRA claims relating to their federal counterparts that have been dismissed, but allowed all other claims in Count IX to proceed.  (*See* ECF Nos. 25, 26.)

P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986), and it is material "if, under the substantive law, it would affect the outcome of the suit."  *United Therapeutics Corp. v. Sandoz, Inc.*, Civ. Nos. 12–CV–1617, 13–CV–316, 2014 WL 1405044, at *1 (D.N.J. Apr. 10, 2014) (citing *Anderson*, 477 U.S. at 248).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

A movant for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has made this showing, the burden then shifts to the party opposing summary judgment to proffer "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) (providing that a party alleging a fact is genuinely disputed "must support the assertion by . . . citing to particular parts of materials in the record").

## III.   <u>DISCUSSION</u>

### A.   GENUINE DISPUTE OF MATERIAL FACT REGARDING WANG'S WHEREABOUTS AND PHOTO IDENTIFICATION

As an initial matter, there is a genuine dispute of material fact regarding (1) whether, on February 9, 2016, Wang's car was actually present in the parking lot adjacent to the Spa, (2) whether Wang was driving the Infiniti February 9, 2016, (3) whether the Eyeball correctly matched the driver exiting the Infiniti to Wang's DMV photo, and (4) whether Sefick correctly identified Wang as "Lupe" with whom he had the sexual encounter. (Czech Dep. at 60:11-15, 70:18–71-16; Cipot Dep. at 47:1-48:15; 63:10-19.)

Czech based his case against Wang entirely on the one-time out-of-court photo identification from her DMV Photo. (Ps' Counterstmt. of Fact ¶ 77; Czech Dep. 104:3-11; *see also id.* at 131:9-14 (confirming that "there is no other evidence in the reports or in the record that support [his] prosecution . . . of Yujue Wang for those five crimes . . . other than the photo identification"), *id.* at 159:9-15 (the "sticking point" Czech claimed supported probable cause was that the Infiniti arrived at the Spa and the NJSP determined through a DMV inquiry that it was registered to Wang.) As such, the facts surrounding the DMV Photo identification are crucial to the resolution of this case.

On the other hand, Wang testified that her husband was driving the Infiniti on February 9, 2016; that he often used the car to deliver food or drop off promotional fliers from the couple's restaurant in the surrounding areas; that Wang was not present in the car at the time, had never been to the Spa, and "barely drive[s] that car" even though it is registered in her name; and that she had never delivered food herself using the Infiniti. (D's SUMF ¶¶ 15, 19; Ps' Response to D's SUMF ¶ 15; Ps' Counterstmt. of Fact ¶ 37; Wang Dep. at 39:16-23; 41:24-42:6, 94:20-95:19, 96:24–97:10; ECF No. 117-11 Ex. G; Czech Investig. Tr. at 19:19-20.)

It is undisputed, however, that Czech did not follow certain required NJSP procedures regarding a detailed description of the photo identification (Czech Dep. at 22:10–24:20); and that other troopers including Cipot and Garland failed to preserve the DMV Photo in evidence.  (*See, e.g.*, Cipot Dep. at 61:10–62:3; Garland Dep. at 57:23–58:3; Garland Cert. at 2 ¶ 4–7, 16; ECF No. 129-20 Ex. P.)  It is undisputed that Sefick does not recall who showed him the DMV Photo. (Sefick Dep. 87-18–88-5; *see also* Cipot Dep. at 46:2-9).  It is also undisputed that the NJSP officers do not recall either the identity of the trooper who originally ran the Infiniti license plate (Cipot Dep. at 47:1-48:15), or the identity of the Eyeball who allegedly observed Wang's vehicle enter the Spa's parking lot and observed Wang and an unknown passenger exit the vehicle and enter the Spa.  (Czech Dep. at 60:11-15.)  Lastly, the parties do not dispute that the NJSP have not produced photographs or videos of the Infiniti parked in the lot.  (Blaettler Rep. at 34.)  Taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could find for Plaintiffs. Accordingly, the Court finds that there is a genuine dispute of material fact as to Wang's whereabouts on February 9, 2016 and as to the validity of the identification of Wang at the Spa premises by the Eyeball and Sefick.

## B.   COUNT I (42 U.S.C. § 1983 FALSE ARREST/IMPRISONMENT)

Defendant argues that he is entitled to summary judgment in his favor as to Counts I (False Arrest/Imprisonment), II (Malicious Prosecution), and IX (NJCRA) because there was probable cause supporting Wang's arrest and prosecution.  (*See* Moving Br. at 9.)  Defendant also argues that the record does not support that he made any false statements or omissions in applying for the arrest warrant in the Superior Court.  (*See id.* at 9, 12–14.)  Lastly, Defendant argues that he is entitled to qualified immunity.  (*See id.* at 19.)  Defendant initially argued that Plaintiffs' claims are time barred.  (*See* Moving Br. at 6–9).  However, Defendant conceded on reply that this argument was inapposite.  (*See* Reply Br. at 2.)  Plaintiffs respond that Czech's Affidavit in support

of the arrest warrant contained material omissions, was made with reckless disregard for the truth, and contained fabricated evidence, all of which defeat probable cause.  (*See* Opp'n Br. at 9.) Plaintiffs argue that Sefick's out-of-court photo identification of Wang never occurred or alternatively was deficient, unduly suggestive, unreliable, and potentially subject to cross-racial identification bias, and that Czech knew or recklessly disregarded this in his Affidavit.  (*See id.* at 17–21.)  Plaintiffs additionally argue that Czech failed to further investigate material exculpatory evidence.  (*See id.* at 21–22.)  Lastly, Plaintiffs contend that Czech is not entitled to qualified immunity because he had no probable cause for Wang's arrest and prosecution.  (*See id.* at 29.) For the reasons stated below, a genuine dispute of material fact as to the facts underlying probable cause precludes summary judgment.

1.    42 U.S.C. § 1983 Standard

The text of 42 U.S.C. § 1983 ("§ 1983") provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must demonstrate that (1) the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) the conduct challenged was committed by a person acting under color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

2.    False Arrest and Probable Cause Standard

Section 1983 claims for false arrest and false imprisonment are rooted in the Fourth Amendment protection against unreasonable seizures.  *See Groman v. Twp. of Manalapan*, 47 F.3d

18

628, 636 (3d Cir. 1995); *Garcia v. County of Bucks*, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001).  To

prevail on a claim for false arrest or false imprisonment under § 1983, a plaintiff must show that

she was arrested without probable cause.  *Mikhaeil v. Santos*, 646 Fed. App'x 158, 162 (3d Cir.

2016); *Groman*, 47 F.3d at 634.  Probable cause is a complete defense to claims under the Fourth

Amendment for both false arrest and false imprisonment.  *See, e.g.*, *Goodwin v. Conway*, 836 F.3d

321, 327 (3d Cir. 2016); *Manuel v. City of Joliet*, 580 U.S. 357, 364–65 (2017).

"The probable-cause standard is incapable of precise definition or

quantification."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  However, reasonableness is "the

touchstone[.]"  *Hill v. California*, 401 U.S. 797, 804 (1971).  Therefore, probable cause for an

arrest exists "whenever reasonably trustworthy information or circumstances within a police

officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an

offense has been committed by the person being arrested."  *United States v. Myers*, 308 F.3d 251,

255 (3d Cir. 2002); *see also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 789 (3d Cir. 2000)

(quoting *Hunter v. Bryant*, 502 U.S, 224, 228 (1991)).  "[P]robable cause requires only a

probability or substantial chance of criminal activity, not an actual showing of such activity."

*Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983).  Courts analyze probable cause using a "common

sense approach" based on the "totality of the circumstances."  *Paff v. Kaltenbach*, 204 F.3d 425,

436 (3d Cir. 2000).

A facially valid warrant generally establishes probable cause for an arrest.  *See, e.g.*, *Baker

v. McCollan*, 443 U.S. 137, 144 (1979) (collecting cases).  However, "an arrest warrant issued by

a magistrate or judge does not, in itself, shelter an officer from liability for false arrest."  *Wilson v.

Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.

1997)); *Rothermel v. Dauphin Cty., Pa.*, Civ. No. 16-1669, 2020 WL 1467267, at *5 (M.D. Pa.

Mar. 26, 2020) ("[A]n erroneously issued warrant—that is, one that is facially valid but genuinely invalid—does not supply probable cause for arrest."), *aff'd*, 861 Fed. App'x 498 (3d Cir. 2021); *Berg v. Cty. of Allegheny*, 219 F.3d 261, 271 (3d Cir. 2000) (same).   In presenting an Affidavit of probable cause to a neutral magistrate, the officer "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."   *Wilson*, 212 F.3d at 790 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)); *see also Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).   "[A] plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff [alleges]: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'"   *Wilson*, 212 F.3d at 786–87 (citation omitted) (emphasis added); *see also Tucker v. City of Phila.*, 679 F. Supp. 3d 127, 137–38 (D.N.J. 2023).   As such, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause."   *Gates*, 462 U.S., at 239; *see also U.S. v. Leon*, 468 U.S. 897, 915 (1984).   "Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, *Gates*, 462 U.S., at 238–239, or because the form of the warrant was improper in some respect."   *Id.*

Although the question of probable cause in a § 1983 case is generally one for a jury, *see Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998); *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 638 (D.N.J. 2011), when there are no material disputed facts, the Court may resolve

the issue as a matter of law.  *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 788–89 (3d Cir. 2000).   However, "[c]ourts should exercise caution before granting a defendant summary judgment" in such cases "when there is a question of whether there was probable cause for the initiation of the criminal proceeding."  *Halsey v. Pfeiffer*, 750 F.3d 273, 300 (3d Cir. 2014).  This is because, "generally, the existence of probable cause is a factual issue," and it "certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if reasonable minds could differ on whether he had probable cause for the institution of the criminal proceedings based on the information available to him." *Id.* (internal quotations and citations omitted); *see also Castro v. New Jersey*, 521 F. Supp. 3d 509, 514, 522–23; *Merkle*, 211 F.3d at 788–89 (applying the same principle to § 1983 false arrest claim).

Plaintiffs contend that the affidavit sworn by Czech reflected a false version of events and that an accurate affidavit would not have established probable cause.  (*See* Opp'n Br. at 9.) Plaintiffs must make two showings to succeed on their claim for false arrest made pursuant to warrant: first, that Defendant Czech, with at least a reckless disregard for the truth, "made false statements or omissions that create[d] a falsehood in applying for a warrant," and second, that those assertions or omissions were "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (quoting *Sherwood*, 113 F.3d at 399); *see also Dempsey*, 834 F.3d at 468–69.  Although evidence must be considered in the light most favorable to Plaintiffs, courts have held that it is necessary to consider both favorable and unfavorable facts an officer otherwise would have been able to consider—to determine whether "any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving

party, did not demonstrate a 'fair probability' that a crime occurred." *Dempsey*, 834 F.3d at 468.

As discussed below, Plaintiffs have made the required showings to survive summary judgment.

3.    <u>Genuine Dispute of Material Fact as to Probable Cause</u>

Although the arrest warrant the Superior Court issued for Wang's arrest was facially valid,

*see* Arrest Warrant), there are genuine disputes of material fact as to whether it was reasonable for

Czech and the other NJSP officers to arrest and detain Wang based on their investigation.  As such,

a reasonable jury could determine that there was no probable cause to arrest and detain Plaintiff,

and therefore that Czech's actions in doing so were unreasonable.

In his deposition, Czech admits that when he submitted the Affidavit in support of Wang's

arrest warrant there was "absolutely zero evidence against Yujue Wang for any allegation of

racketeering, laundering, or conspiracy" under N.J. Stat. 2C:41-2(c) and N.J. Stat. 2C:5-2(a), as

far as the day-to-day operations of the alleged prostitution operation.  (Czech Dep. at 141:1-7;

Opp'n Br. at 20.)  Both parties' experts also agree that "zero evidence has been produced showing

Ms. Wang assisted the other named parties in any way.  No evidence has been produced showing

that Ms. Wang knew any of the other parties.  The statement Czech swore to under oath that Ms.

Wang conspired with the other named parties is false, misleading, and not supported by any

evidence or facts."  (Rep. of Dr. Richard Celeste, "Celeste Rep.", ECF No. 117-20 Ex. Y at 39

(quoting Blaettler Rep. at 49).)  Further, both experts agree that the "Affidavit submitted by

Defendant Czech and signed by a judge was factually incorrect and misleading" (Celeste Rep. at

39 (quoting Blaettler Rep. at 36)), although Defendant's expert did not opine on whether Czech

provided the information to the Superior Court purposely or knowingly.  (*See id.*)  Defendant

concedes on reply that "there may not have been probable cause as to racketeering, money

laundering, or conspiracy."  (Reply Br. at 2–3; *see also* Opp'n Br. at 20.)

22

Probable cause for one offense serves as a defense to § 1983 claims even where a plaintiff is arrested on multiple charges.  *Startzell v. City of Phila.*, 533 F.3d 183, 204 n.14 (3d Cir. 2008) (citation omitted); *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).  Defendant maintains that probable cause existed to arrest and detain Plaintiff on the third degree promoting prostitution charge, N.J. Stat. 2C:34-1(b)(2), and the disorderly persons offense of prostitution under N.J. Stat. 2C:34-1(b)(1), "based on the photograph [ ] Sefick" identified, which led him to believe [Wang] was part of the prostitution "network."  (Czech Dep. at 140:10-12.)  In addition, Defendant states that "Plaintiff was observed entering the spa, engaging in sexual activity for money, and was then [ ] identified through her driver license photo by the official who observed Plaintiff's sex acts."  (Reply Br. at 3; D's Reply Supp ¶¶ 131–33 (citing D's SUMF ¶¶ 8–13).)[12] However, Wang maintains she has never been to the Spa, was not there on February 9, 2016, and was not driving the Infiniti on that day.  (D's SUMF ¶ 15; Wang Dep. at 39:22-23; 94:20-95:19, 97:2-8.)  The stark distinction between these two versions of events gives rise to a factual dispute which only the fact-finder may resolve.

Defendant has failed to show there is no dispute of material fact as to the facts underlying probable cause.  As an initial matter, Wang reported to the police barracks of her own volition after receiving the call from NJSP  (*see* Ps' Counterstmt. of Fact ¶¶ 12–14), and a reasonable jury could conclude this should have alerted Czech that her arrest would be unreasonable without further investigation.  Moreover, the undisputed facts suggest Czech knew or recklessly disregarded, at the time he submitted his Affidavit to the Superior Court, key information about

---

[12] Defendant also claims that probable cause existed because the Infiniti remained at the Spa after the NJSP officials left around 4:30 or 5:30pm "and there were no deliveries observed, undermining Plaintiff's allegation she had never been at the spa or that her husband was simply making deliveries."  (*Id.* (citing D's SUMF ¶¶ 8, 14–16); *see also* Czech Affidavit at 22; Czech Investig. Tr. at 13:1-18; Czech Dep. at 146:10-11, 159:9-15.)  Nevertheless, the fact that NJSP officials did not observe any deliveries while they were parked outside the Spa is not highly probative because Wang testified that her husband may have been distributing promotional materials for the restaurant in the nearby areas and was not necessarily making food deliveries on February 9, 2016.  (Wang Dep. at 97:2-8.)

Wang that differentiated her from the other named suspects in his Affidavit.  First, Wang was "not like the other three" suspects.  (Czech Dep. at 136:11-17, 137:25–138:2.)  She was the "only individual with no prior connections to prostitution[.]"  (*Id.*)  There was no evidence connecting Wang to the safe deposit box associated with money laundering that was named in the Affidavit.  (*See* Czech Dep. at 151:15–152:7.)  Nor was there evidence connecting her with any of the 3,800 pages of financial records Czech contends gave him probable cause to support arrests for money laundering, racketeering, and conspiracy, as well as the existence of a prostitution operation.  (*See id.* at 152:8–153:10.)

Furthermore, at no point did Czech, as the case agent, engage in further investigation to confirm that "Lupe" was the same person as Wang, despite authorizing an investigation that involved surveillance of the Spa and other locations and vehicles on multiple occasions, and compiling thousands of pages of bank records.  (*See* Blaettler Rep. at 12, 46; *see also* Opp'n Br. at 21.)  In fact, other than a trooper's alleged observation of Wang's car in the parking lot adjacent to the Spa, the Eyeball's alleged identification of Wang exiting the vehicle, and Sefick's alleged out-of-court photo identification of her as "Lupe", Czech and the NJSP produced no other evidence implicating Wang specifically and did not attempt to obtain further evidence before arresting her.

First, February 9, 2016, was the first time NJSP troopers had seen the Infiniti in the parking lot outside the Spa and they did not observe the Infiniti on any other day of their field surveillance.  (*See* Czech Dep. at 159:16-25, 160:1-6.)  Second, NJSP did not observe the person they believed to be Wang on any day other than February 9, 2016.  (*See* Czech Dep. at 101:1-9.)  Third, the Eyeball first identified Wang from more than 100 feet away (*see* Czech Dep. at 58:6-15; Cipot Dep. 69:11–70:22; ECF No. 129-14 Ex. J.), and NJSP observed the person they identified as Wang for less than one hour in total.  (*See* Czech Dep. at 146:10-11; "Czech Investig. Tr.", ECF No. 117-

13 Ex. J at 13:1-18.)  Fourth, despite suspecting Wang of criminal activity after allegedly observing

the Infiniti in the parking lot on February 9, 2016, Defendant did not seek a search warrant for the

Infiniti to obtain further evidence.  (*See generally* Czech Affidavit; Czech Dep. at 163:11-18.)

Lastly, although the Affidavit indicated that the prostitution "network" used multiple vehicles and

multiple locations, there was no evidence that Wang was involved with more than one location

(*see* Czech Dep. at 142:18-20) or with any vehicle other than the Infiniti (*see* Czech Affidavit at 5

¶ 3, 8–9 ¶ 6; Czech Dep. at 138:13-17), and Wang was never observed at the other surveillance

location, Green Nature's Therapy.  (*See* Czech Dep. at 150:15-17.)

Czech does not explain why he failed to include this information in the Affidavit, nor why

he failed to investigate further before arresting Wang.  Moreover, Czech does not explain why,

despite his awareness of the NJSP requirements and NJAG guidelines requiring detailed

documentation of out-of-court photo identification procedures (*see* Czech Dep. at 12:1–13:6),

Czech failed to document in any of his reports (*see generally* Czech Investig. Rep.; Czech Supp.

Rep.; Czech Investig. Tr.) where the photo identification of Wang occurred, any conversation

surrounding the identification, Sefick's level of confidence in the identification, whether Sefick

was shown only one photograph or multiple photographs, and who exactly was present during

Sefick's out-of-court photo identification.  (*See* Czech Dep. at 22:10–24:20.)

Defendant's expert opined that Czech's actions were objectively reasonable in light of the

circumstances, that he acted in good faith, and that he was not liable because he "acted under the

supervision of decision makers and his actions were not the cause of Plaintiff's arrest and

associated harm unless it can be determined that he acted knowingly and purposely to harm

Plaintiff by alleging unlawful acts for which there was not a basis."  (Celeste Rep. at 50–51.)

However, a reasonable jury could determine that Czech acted at least recklessly in omitting this

information from the Affidavit and that certain statements included in the Affidavit were false or misleading. Czech testified Plaintiff "was identified on that day [February 9, 2016], you know, so she's part of the organization." (Czech Dep. at 101:16-17.) However, a reasonable jury could conclude that Czech's statements that "video and physical surveillance at multiple locations, Grand Jury Subpoenas and extensive analysis of bank records" implicated Wang in any way or that Wang was part of a "larger prostitution network" that "laundered currency" was false and that the Affidavit omitted key differentiating factors between Wang and the other suspects that were material to a finding of probable cause. (*See* Czech Affidavit at 5 ¶ 3, 8–9 ¶ 6.)

Czech's conduct is particularly concerning given that the Third Circuit has recognized "the inherent unreliability of . . . cross-racial identifications. . . ." *United States v. Reed*, 173 Fed. App'x 184, 188 (3d Cir. 2006) (citation omitted); *see also United States v. Hannigan*, 27 F.3d 890, 900 (3d Cir. 1994); *U.S. v. Graves*, 465 F. Supp. 2d 450, 456 (D.N.J. 2006). Courts in this district have allowed testimony about the "diminished accuracy of cross-racial identifications relative to same-race identifications." *See, e.g.*, *US v. Norwood*, 939 F. Supp. 1132, 1137 (D.N.J. 1996). The Court does not opine on whether, as Plaintiffs contend (*see* Ps' Counterstmt. of Fact at ¶ 90), the NJSP failed to properly train its employees on the perils of photo identification including cross-racial identification bias. (*See* NJSP OPS Rep. at Wang 119; Czech Dep. at 71:13–72:16; Cipot Dep. at 55:19–56:2, 56:11–57:5.) However, DAG Daab admitted that Sefick's (a white male) cross-racial identification of Wang (an Asian woman) would have been inherently unreliable. (*See* NJSP OPS Rep. at Wang 119.) Sefick also testified that because of the passage of time, it would be "incredibly difficult" to identify Wang "with similar looking Asian females in a lineup." (Sefick Dep. 12:7-17.) These facts, taken in the light most favorable to Plaintiffs, arguably show that Czech acted unreasonably in neglecting to consider potentially exculpatory facts or include such

facts in the Affidavit, and in failing to further investigate any evidence implicating Wang, including the out-of-court photo identification.

### 4.   Genuine Dispute of Fact as to Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauley*, 580 U.S. 73, 78–79 (2017) (citation and internal quotation marks omitted). "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 79. This is a two-part analysis: first, a court considering qualified immunity must decide "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 432 (D.N.J. 2011) (quoting *Montanez v. Thompson*, 603 F.3d 243, 250 (3d Cir. 2010)). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct." *Id.* The second prong involves an inquiry as to "'whether a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Id.* at 439 (quoting *Ciardiello v. Sexton*, 390 Fed. App'x 193, 199 (3d Cir.2010)). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* at 432.

Although the determination of "whether an officer made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury," the Third Circuit has recognized that a judge could "decide the objective reasonableness issue once all the historical facts are no longer in dispute." *Curley v. Klem*, 499 F.3d 199, 211 & n.12 (3d Cir. 2007). To do this, "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." *Id.* In other words,

"[w]hen the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, . . . but responsibility for answering that ultimate question remains with the court." *Id.* (internal citation omitted).

Because there is a genuine dispute of material fact as to the facts underlying probable cause, there is also a genuine dispute as to whether Czech had qualified immunity when he arrested and detained Wang. *Trafton*, 799 F. Supp. 2d at 432; *Ciardiello*, 390 Fed. App'x at 199. The apparency of the constitutional violation at issue in this case to a reasonable police officer hinges on which version of events is accepted by the jury. If Wang was not, in fact, correctly identified by the Eyeball and Sefick, the unlawfulness of Defendant's actions may be readily apparent to an objectively reasonable police officer. On the other hand, the jury may find other facts that would entitle Defendant to qualified immunity as a matter of law. Accordingly, if and when the time arrives, the Court will employ special interrogatories, as necessary, to determine, as a matter of law, whether Defendant is shielded by qualified immunity. On the present record, however, accepting Wang's testimony as true, Defendant may have committed a constitutional violation by falsely arresting Wang. At this juncture, the Court cannot definitively determine whether qualified immunity should exonerate Defendant.

The Court concludes that Plaintiffs' Section 1983 false arrest claim against Defendant may proceed. Accordingly, summary judgment will be **DENIED** as to Count I.

## C.    COUNT II (42 U.S.C. § 1983 MALICIOUS PROSECUTION)

Defendant argues in support of summary judgment in his favor on Count II that the malicious prosecution claim fails because there is no evidence of any improper purpose by Czech because he reasonably believed Wang was engaged in prostitution, and there was probable cause for Wang's arrest. (*See* Moving Br. at 14–15.) Plaintiffs argue that Czech's malice can be inferred

by lack of probable cause supporting her prosecution.  (*See* Opp'n Br. at 22.)  As discussed below,

genuine disputes of material fact underlying both probable cause and malice preclude summary

judgment.

The elements of a § 1983 malicious prosecution claim arising out of the Fourth

Amendment are:

> (1) the defendant initiated a criminal proceeding; (2) the
> criminal proceeding ended in [plaintiffs'] favor; (3) the
> defendant initiated the proceeding without probable cause;
> (4) the defendant acted maliciously or for a purpose other
> than bringing the plaintiff to justice; and (5) the plaintiff
> suffered deprivation of liberty consistent with the concept of
> seizure as a consequence of a legal proceeding.

*Johnson v. Knorr*, 477 F.3d 75, 81–82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d

497, 521 (3d Cir. 2003)); *see also Heck v. Humphrey*, 512 U.S. 477, 484–489 (1994).  The injuries

arising from a malicious prosecution claim occur at the time the underlying criminal charges are

filed.  *See Campanello v. Port Auth. of New York & New Jersey*, 590 F. Supp. 2d 694, 702–03

(D.N.J. 2008); *City of Erie, Pa. v. Guaranty Nat. Ins. Co.*, 109 F.3d 156, 159 (1997).  Malice is

defined as "the intentional doing of a wrongful act without just cause or excuse."  *Biaggi-Pacheco*

*v. City of Plainfield*, Civ. No. 16-3511, 2017 WL 4618751, at *6 (D.N.J. Oct. 13, 2017) (quoting

*Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 395–96 (N.J. 2009)).  Malice can also be

demonstrated by "either ill will in the sense of spite, lack of belief by the actor himself in the

propriety of the prosecution, or its use for an extraneous improper purpose."  *Lee v. Mihalich*, 847

F.2d 66, 70 (3d Cir. 1988), *abrogated on other grounds by Albright v. Oliver*, 510 U.S. 266 (1994).

"Malice is an independent element, requiring something above and beyond mere lack of probable

cause, although the absence of probable cause is highly probative."  *Biaggi-Pacheco*, 2017 WL

4618751, at *6; *see also Morales v. Busbee,* 972 F. Supp. 254, 261 (D.N.J. 1997) (stating that

"malice may be inferred from lack of probable cause."). Therefore, a malicious prosecution allegation must "contain extrinsic evidence of malice." *Id.*

As discussed, Defendant has not succeeded in showing there is no genuine dispute of material fact as to the element of probable cause. Further, there is a genuine dispute of material fact as to the facts underlying the element of malice. First, as discussed above, a reasonable jury could find that Czech failed to consider or include key exculpatory facts regarding Wang when presenting his Affidavit to the Superior Court. Second, Czech failed to document the specifics of the photo identification of Wang, which could have provided additional evidence to support probable cause. (*See generally* Czech Investig. Rep.; Czech Supp. Rep.; Czech Investig. Transcr.) Third, no operation plans or surveillance activity logs have been produced for the February 9, 2016 Field Investigation, and Czech and NJSP cannot recall if they were ever prepared, despite NJSP SOP requiring such documentation. (*See* Czech Dep. at 73:15-24–74:7, *id.* at 74:8–75:1; Cipot Dep. 27:21-28:4, 28:10-13.) Fourth, NJSP's Internal Investigation report found that "Det. I Quirk and Det. I Czech admitted the sole reason they arrested Ms. Wang was because she was the registered owner of a car that parked in a public parking lot on the premises where the alleged criminal activity took place." (NJSP OPS Rep. at Wang 119.) Lastly, Czech admitted to DAG Daab at the time of the probable cause hearing that Sefick said he "think[s]" Wang was the person he observed at the Spa, and Czech thought the evidence against Wang "would not hold up in court" with the passage of time. (ECF No. 129-13 Ex. I at 11:1-14; NJSP OPS Rep. at NJSP Wang 119.) Taking the facts in the light most favorable to Plaintiffs, a reasonable jury could determine that Czech took the Eyeball's and Sefick's identifications of Wang at face value and acted at a minimum unreasonably when considering the totality of the circumstances by failing to question the veracity of the photo identifications, to engage in further investigation, or to consider the

30

unique circumstances of Wang's case.  (*See* Czech Dep. at 136:11-17, 137:25–138:2.)  Therefore, a reasonable jury could find, as Plaintiffs contend (*see* Opp'n Br. at 23; Blaettler Rep. at 66–67), that Czech lacked belief in the propriety of the prosecution as to Wang, or acted for a purpose other than bringing the perpetrators of the criminal operation to justice.

Accordingly, summary judgment will be **DENIED** as to Count II.

## D.    COUNT III (42 U.S.C. § 1985 CONSPIRACY)

Defendant argues in support of summary judgment in his favor on Count III that there is no evidence of discriminatory animus against Plaintiff and no evidence of a conspiracy.  (*See* Moving Br. at 17.)  Defendant also argues Plaintiffs have not shown that Defendant treated Wang differently than others similarly situated.  (*See* Reply Br. at 6.)  Plaintiffs respond that Wang has pleaded a prima facie case for conspiracy because she alleges Czech acted in concert with Sefick, Cipot, and other NJSP officers and intentionally and without rational basis treated her differently from others similarly situated.  (*See* Opp'n Br. at 28.)  Plaintiffs also argue that a reasonable jury could infer an "agreement" and "concerted action" between Czech, Sefick, and Cipot if a jury finds the alleged out-of-court identification by Sefick did not occur.  (*See id.* at 25.)  Notably, Plaintiffs attempt to argue that although the Complaint only alleges conspiracy under 42 U.S.C. § 1985 ("§ 1985"), the facts also give rise to a conspiracy claim under § 1983.  (*See id.* at 24.)  However, because Plaintiffs did not allege § 1983 conspiracy in the Complaint, the Court declines to address Plaintiffs' arguments pertaining to § 1983 conspiracy.

In order to state a claim under § 1985 ("§ 1985"), plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *See United Brotherhood of*

*Carpenters & Joiners Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983); *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). Conspiracy allegations satisfying the first element "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Sup. Ct. of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009) (citation omitted).

Here, even viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find evidence of concerted action. Plaintiffs infer conspiracy from the following set of facts: First, the NJSP troopers were unable to state who ran the Infiniti license plate and determined it was registered to Wang, (*see* Ps' Counterstmt. of Fact ¶¶ 85–86, 92, 102; Cipot Dep. at 47:1-48:15), and Czech does not recall the identity of the Eyeball who allegedly observed Wang's vehicle enter the Spa's parking lot and observed Wang and an unknown passenger exit the vehicle and enter the rear of the Spa. (*See* Czech Dep. at 60:11-15; *see also* Blaettler Rep. at 34.) Second, Plaintiffs point to the fact that the Eyeball did not identify any details about the passenger who exited the Infiniti, including their gender and race. (*See* Ps' Counterstmt. of Fact ¶ 94; Cipot Dep. at 73:13–74:13.) Third, Plaintiffs note that NJSP has failed to state the time the Infiniti entered the parking lot adjacent to the Spa or produce any photographs or videos of the Infiniti parked in the lot. (*See* Blaettler Rep. at 34.) Fourth, Plaintiffs place emphasis on Sefick's testimony that he does not recall who showed him the DMV Photo. (*See* Sefick Dep. 87-18–88-5; *see also* Cipot Dep. at 46:2-9; Ps' Counterstmt. of Fact ¶ 119; D's Reply Supp. ¶ 119.)

The Court is mindful of the NJSP's apparent procedural failures and deficiencies in the investigation, stating that: (1) Czech did not document certain details about the photo identification procedure (*see generally* Czech Investig. Rep.; Czech Supp. Rep.; Czech Investig. Transcr.; Sefick Dep. at 70:12–71:2); (2) NJSP officers did not enter, or do not recall entering the DMV Photo into

the NJSP evidence database (*see* Cipot Dep. at 61:10–62:3); (3) NJSP did not produce the DMV Photo during the discovery period and failed to do so prior to filing the Reply (*see* Ps' Counterstmt. of Fact ¶¶ 109–11; ECF No. 129-18 Ex. N; "Garland Cert.", ECF No. 129-19 Ex. O); (4) the DMV Photo was not listed on the NJSP Internal Investigation Attachment Log and the NJSP do not recall preserving the DMV Photo (*see* Garland Dep. at 57:23–58:3; Garland Cert. at 2 ¶ 4–7, 16; ECF No. 129-20 Ex. P); and (5) NJSP officials failed to provide an operations plan (*see* Czech Dep. at 74:8–75:1), and a surveillance activity log for the February 9, 2016 Field Investigation (*see* Ps' Counterstmt. of Fact ¶ 76; *see also generally* Surveillance Activity Logs), despite these documents being required by NJSP SOP and despite NJSP providing these documents for other investigation dates.  (*See* Blaettler Rep. at 54.)  Plaintiffs' expert opined that these procedural errors were "gross failures and violations of police practices and procedures by the investigating troopers and Czech." (Blaettler Rep. at 34.)

Notwithstanding all of the errors made by the NJSP here, there is no evidence to suggest that NJSP engaged in a concerted cover-up operation targeting Wang for race-based reasons.  As to Czech himself, there is no evidence to suggest these procedural failures were orchestrated together with the other NJSP officers.

In sum, viewing the facts in the light most favorable to Plaintiffs, the Court finds that no reasonable jury would find a conspiracy against Wang.  Accordingly, summary judgment is **GRANTED** as to Count III.

### E.      COUNT IX (VIOLATION OF N.J. STAT. 10:6-1 TO 2 (NJCRA))

As to Plaintiffs' NJCRA claims, Plaintiff incorporates the same arguments as her § 1983 false arrest/imprisonment, malicious prosecution, and conspiracy claims.  (*See generally* Opp'n

Br.)[13]  Defendants respond with the same arguments as for the § 1983 claims.  (*See* Moving Br. at 9.)

The NJCRA was modeled after § 1983, and "courts in New Jersey have consistently looked at claims under the NJCRA 'through the lens of § 1983[,]'" thereby construing the NJCRA in terms similar to its federal counterpart.  *See, e.g.*, *Samoles v. Lacey Twp.*, Civ. No. 12–3066, 2014 WL 2602251, at \*15 (D.N.J. June 11, 2014) (citation omitted); *Hartfelder v. N.J. State Police*, Civ. No. 165461, 2017 WL 3184173, at \*5 (D.N.J. July 26, 2017); *Armstrong v. Sherman*, Civ. No. 09–716, 2010 WL 2483911, \*5 (D.N.J. June 4, 2010) ("[T]he [NJRCA] is a kind of analog to section 1983."); *Chapman v. New Jersey*, Civ. No. 08–4130, 2009 WL 2634888, \*3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983.").  Therefore, The NJCRA is interpreted nearly identically to § 1983 and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under § 1983.  *Trafton*, 799 F. Supp. 2d at 443–44.

As set forth above, Defendant has shown there is no genuine dispute of material fact as to the facts underlying Plaintiffs' claim for conspiracy, but there are genuine disputes of material fact as to the facts underlying probable cause and malice.  Accordingly, summary judgment will be **GRANTED** as to the portion of Count IX pertaining to Plaintiffs' NJCRA conspiracy claims. Summary judgment will be **DENIED** as to the portion of Count IX pertaining to Plaintiffs' NJCRA false arrest/imprisonment and malicious prosecution claims.

---

[13] Although Plaintiff contends her NJCRA claims include claims for negligent/intentional infliction of emotional distress (*see* Ps' Response to D's SUMF ¶ 2), the Court will only discuss here the NJCRA false arrest/imprisonment, malicious prosecution, and conspiracy claims.  Plaintiffs' negligent/intentional infliction of emotional distress claims are properly characterized as tort claims and are therefore governed by the N.J. Stat. 59:8-1, *et seq.*  As discussed *infra*, summary judgment will be granted in Defendant's favor as to Plaintiffs' tort claims.

F.   **COUNT X (NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) & COUNT XI (PER QUOD)**

Defendant argues that he is entitled to summary judgment in his favor on Plaintiffs' common law claims, Counts X and XI, because Plaintiff failed to file a Tort Claims Notice as required by the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. 59:8-1, *et seq.*, and because his actions were in good faith, triggering immunity from liability under N.J. Stat. 59:3-3. (*See* Moving Br. at 21–23; ECF No. 117-17 Ex. V ¶ 8.)   Defendant argues that he is entitled to summary judgment on Count XI because this Count is dependent on Plaintiffs' tort claims surviving. (*See* Moving Br. at 27.)   Therefore, Defendant argues, because the Negligent Infliction of Emotional Distress ("NIED") and Intentional Infliction of Emotional Distress ("IIED") tort claims fail, the per quod claim also fails. (*See id.*)   Plaintiffs admit they did not file a Tort Claims Notice. (Ps' Response to D's SUMF ¶ 31.)   However, Plaintiffs argue that although they did not specifically state in the SAC that their NIED and IIED claims are § 1983 claims, their mental and emotional distress claims "arise from the deprivation of her constitutional rights, i.e., false arrest/imprisonment, and malicious prosecution," and are therefore brought under § 1983 and not subject to the New Jersey Tort Claims Act. (*See* Opp'n Br. at 30–31.)   Plaintiffs also contend that because there was no probable cause for Wang's arrest and detention, the per quod derivative claim should also survive summary judgment. (*See id.* at 34.)

Unfortunately, because Plaintiffs did not assert the NIED/IIED claims in the SAC as § 1983 claims, the Court declines to address any § 1983 arguments regarding NIED or IIED.   Moreover, the Court notes that Plaintiffs do not cite any case law applicable to § 1983 NIED or IIED claims; rather, Plaintiffs' cited cases pertain to the elements for the *tort* claims of NIED and IIED. (*See* Opp'n Br. at 31–32; Reply Br. at 6.)

The NJTCA governs tort claims against public employees, including police officers. *Castro v. New Jersey*, 521 F. Supp. 3d 509, 514, 518, 525 (D.N.J. 2021); *Fallen v. City of Newark*, Civ. No. 15-2286, 2023 WL 4118142, at \*22 (D.N.J. June 22, 2023).  Under the NJTCA, prior to bringing a tort claim against a public official or entity, a plaintiff must give notice to the entity within 90 days of the injury.  *See* N.J. Stat. 59:8-8.  Otherwise, the plaintiff is "forever barred from recovering against a public entity or public employee[.]"  N.J. Stat. 59:8-8(a).  The NJTCA's requirements apply to claims for IIED and NIED.  *See Velez v. City of Jersey City*, 180 N.J. 284, 294–96 (2004) (answering the question of whether the N.J. Stat. 59:8:8 "statutory definition of injury was so expansive as to include injuries resulting from intentional torts as well as negligence" in "the affirmative") (internal citations omitted); *Fallen*, 2023 WL 4118142, at \*23 (finding the defendant police officers were entitled to summary judgment on their tort claims because "the NJTCA governs common law tort claims for negligent infliction of emotional distress and intentional infliction of emotional distress, the [p]laintiff was required, but failed, to comply with the NJTCA's notice requirements"); *Forcella v. City of Ocean City*, 70 F. Supp. 2d 512, 514 (D.N.J. 1999) (applying NJTCA notice requirements to claims for NIED and IIED).

A per quod claim is "a claim for compensation for the loss of a spouse's companionship and services due to defendant's harmful actions."  *Walker v. City of Newark*, Civ. No. 2023 WL 3478465, at \*23 (D.N.J. May 16, 2023) (quotation omitted).  It is a derivative cause of action, meaning its viability depends on the existence of tortious conduct against the injured spouse (here, Wang).  *Id.*; *see also Alberts v. Gaeckler*, 446 N.J. Super. 551, 565 (Law. Div. 2014) ("If a wife's claim for personal injuries fails, the husband would have no independent ground for a [per quod] consortium claim."); *Tichenor v. Santillo*, 218 N.J. Super. 165, 171 (N.J. App. Div. 1987).  The NJTCA's notice requirements apply to per quod claims.  *Fallen*, 2023 WL 4118142, at \*23.

Here, as Defendants argue, there is no evidence in the record showing compliance with the NJTCA and Plaintiffs do not dispute this. (*See* Moving Br. at 28.) Because Plaintiffs' underlying common law tort claims for NIED and IIED in Count X fail based on their noncompliance with the NJTCA, Plaintiffs' per quod claim (Count XI) for damages must also fail. *See Reilly v. Prudential Prop. & Cas. Ins. Co.*, 653 F. Supp. 725, 735 (D.N.J. 1987) (because the plaintiff's "tort claims [were] dismissed, there [was] no underlying tort on which the [per quod] loss of consortium claim can rest"). Summary judgment will therefore be **GRANTED** as to Count X and Count XI.

### G.     COUNT XII (PUNITIVE DAMAGES)

Defendant argues summary judgment should be granted in his favor on Count XII because no independent cause of action exists for punitive damages. (*See* Moving Br. at 27.) Plaintiffs do not specifically respond to this argument. (*See generally* Opp'n Br.)

As a general rule, there is no independent cause of action for "punitive damages." *See, e.g., Incorvati v. Best Buy Co., Inc.*, Civ. No. 10-1939, 2010 WL 4807062, at *12 (D.N.J. Nov. 16, 2010) (citations omitted). Furthermore, in New Jersey, in order to receive a punitive damages award, a plaintiff must specifically request punitive damages in the Complaint. *See* New Jersey Punitive Damages Act ("NJPDA"), N.J. Stat. 2A:15–5.11 ("An award of punitive damages must be specifically prayed for in the complaint.").

The Court finds that Plaintiffs improperly pled punitive damages as a separate Count in the Complaint. In addition, Plaintiffs failed to comply with the requirements of the NJPDA because Plaintiffs did not include a specific request for punitive damages elsewhere in the Complaint. *Incorvati*, 2010 WL 4807062, at *12 (dismissing the plaintiff's separate count for punitive damages, but finding that the plaintiff appropriately complied with the NJPDA where the plaintiff requested punitive damages for other claims in the Complaint).

Accordingly, summary judgment will be **GRANTED** as to Count XII.

IV.   <u>**CONCLUSION**</u>

For the reasons stated above, the Court will **GRANT IN PART AND DENY IN PART** Defendant's Motion for Summary Judgment (ECF No. 117).  The Motion will be **GRANTED** as to Counts III, X, XI, XII, and the portion of Count IX pertaining to Plaintiffs' NJCRA conspiracy claims.  The Motion will be **DENIED** as to Counts I, II, and the portion of Count IX pertaining to Plaintiffs' NJCRA false arrest/imprisonment and malicious prosecution claims.  An appropriate Order will follow.

Date: **July 30, 2024**

<u>s/ Zahid N. Quraishi</u>
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**